Moncure, J.
after stating the case proceeded :
This case has been argued in this Court with great ability by the counsel on both sides. Various questions of law and fact were raised and discussed in the case, as
1st. Whether the covenant of Richard Hoomes had been broken ? And if broken,
2d. Whether the right of action therefor passed to the assignee Dickinson ? If so,
3d. Whether lands descended in Kentucky could be regarded as assets by descent in any proceeding in Virginia? And if so,
4th. Whether in fact any lands in Kentucky descended from Richard Hoomes to his children; and if they did, whether they were not forfeited for non-payment of taxes, and whether such of them as were held by the children were held by them as purchasers from the State of Kentucky, and not as heirs of their father.
I will now proceed to consider the question first above stated: that is, whether the covenant of Richard Hoomes has been broken ? The only ground on which it is contended to have been broken is, that his children have recovered as purchasers under the will of John Hoomes the elder, one fourth of the land claimed by Dickinson to have been derived under the deed from John Hoomes the younger to Apperson, in which the said covenant is contained. And whether broken or not, depends upon the proper construction of the covenant. If it be a covenant of general warranty, or a covenant of special warranty against the claims of the said children, then it has been broken. But if it be a *384 covenant of special warranty only against the claims of ^ covenantor and his heirs, (technically and properly speaking,) and all persons claiming by, from or under them, then it has not been broken. Let us now see what is its proper construction.
The covenant is in these words : “ And the said John Hoornes, for himself and his heirs, and said William Hoomes, Richard Hoomes, Armistead Hoomes, and Wilson Allen and Sophia his wife, for themselves and their heirs, as contingent devisees or legatees under the will of Col. John Hoomes, late of the Bowling Green, deceased, by whom said land was devised to John Hoomes, do hereby covenant and agree to and with the said Samuel A. Apperson, that they will warrant and defend the fee simple estate and full and complete right and title to said two tracts of land, to him and his heirs and assigns forever, against themselves and their heirs, and against the claim and demand of any person or persons claiming by, from, or under them, in virtue of the will aforesaid, and do relinquish and fully confirm to said S. A. Apperson all the right they or their heirs now have, or might or may hereafter have, to said land or any part thereof, to him and his heirs and assigns forever, free from them, said John Hoomes, William Hoomes, Richard Hoomes, Armistead Hoomes, and Wilson Allen and Sophia his wife, late Sophia Hoomes, and their heirs, and of all other persons in the world.”
If the latter branch of the clause, commencing at the words, “ And do relinquish and fully confirm,” had been omitted in the deed, there would have been no ground whatever for contending that there was any covenant of general warranty on the part of Richard Hoomes. The only question then would have been, whether the covenant of special warranty contained in the former branch of the clause was confined to the claims of the covenantor and those claiming under him, or extended to the claims of his children, whether *385 claiming under him or otherwise. Let us first consider the former branch of the clause separately and ascertain the nature and extent of the covenant therein contained. There is nothing peculiar in that branch of the clause, but the words “ as contingent devisees or legatees under the will of Col. John Hoomes;” and the words, “in virtue of the will aforesaid.” Strike out those words, and the covenant is clearly confined to the claims of the covenantor and those claiming under him. The remaining words are precisely those which are generally used to express such a covenant of special warranty : “And the said Richard Hoomes, &c., for themselves and their heirs, covenant with the said Apperson that they will warrant and defend the estate to him, and his heirs and assigns forever, against themselves and their heirs, and against the claim and demand of any person claiming by, from or under them.” These in substance are the remaining words used, and by no other words or form of expression could such a covenant of special warranty be more plainly or appropriately expressed. In this construction every word has its proper signification. The covenantors intended to bind their heirs, and therefore covenanted for themselves “ and their heirs ;” and they covenanted to warrant the estate against the claims of “ their heirs,” not as purchasers from John Hoomes the elder, but in the technical and proper sense of the word as persons claiming by descent from them. Greenleaf in his treatise on evidence, vol. 1, <§> 287, note 3, properly says that “ the rules of interpretation of wills, laid down by Mr. Wigram in his admirable treatise on that subject, may be safely applied, mutato nomine, to all other private instruments.” They are contained in seven propositions as the result both of principle and authority, of which the two first are as follows :
“ I. A testator is always presumed to use the words in which he expresses himself according to their strict *386 and primary acceptation, unless from the context of the it appears that he has used them in a different sense; in which case the sense in which he thus appears to have used them will be the sense in which they are to be construed.
“ II. Where there is nothing in the context of a will from which it is apparent that a testator has used the words in which he has expressed himself, in any other than their strict and primary sense, and where his words so interpreted are sensible with reference to extrinsic circumstances, it is an inflexible rule of construction, that the words of the will shall be interpreted in their strict and primary sense, and in no other, although they may be capable .of some popular or secondary interpretation, and although the most conclusive evidence of intention to use them in such popular or secondary sense be tendered.”
The word “ heirs,” in its strict and primary sense is a word of limitation; and although it may be capable of some popular or secondary interpretation, yet, being in this case sensible with reference to extrinsic circumstances, it must, according to the foregoing rules, be construed in its strict and primary sense, unless from the context of the instrument, it appears to have been used in a different sense. Does it appear, from the context, to have been used in a different sense ? I am now confining my remarks to the former branch of the clause aforesaid. We have seen that the only peculiarity therein consists in the words, “ as contingent devisees or legatees under the will of Col. John Hoomes,” and the words “ in the will aforesaid.” Do these words take from the word “ heirs” in the context, its strict and primary meaning, and give it a popular and secondary signification? The covenant with the addition of these words is in substance as follows. “And the said Richard Hoomes &c., for themselves and their heirs, as contingent devisees or legatees under the *387 will of Col. John Hoomes, covenant with the said Apperson, that they will warrant and defend the estate to him and his heirs and assigns forever, against themselves and their heirs, and against the claim and demand of any person claiming by, from or under him, in virtue of the will aforesaid.” I do not think the additional words were intended to enlarge the covenant, or to extend it to persons not claiming by, through or under the covenantors. I rather think if they were intended to have any effect at all on the covenant, they were intended to restrict it to persons claiming as contingent devisees, or in virtue of the will, and by, through or under the covenantors. So that a claim of the covenantors or their heirs in any other right than in virtue of the will would not come within the scope of the covenant. The chief object in using these words doubtless was to shew the interest of Richard Hoomes and others in the subject, and their reason for uniting in the execution of the deed. The land had been devised to John Hoomes the younger in fee ; and he had sold and conveyed it to Apperson, and received the purchase money. But Richard Hoomes and others were devisees in remainder on the contingency of their surviving John Hoomes the younger, and of his dying without issue: And they were willing to relinquish to the purchaser their contingent rights, and to warrant the title against all persons claiming under them in virtue of those rights. They therefore covenant “as contingent devisees,” and against claims under them “ in virtue of the will.” To give to these additional words the effect of extending the covenant to persons not “ claiming by, through or under” the covenantors, would be to render inoperative the words “ by, through or under.” And thus words which are plain, usual, and well understood, would be rendered ineffectual by a strained construction of words which are at least very equivocal. Now it is a settled rule of con *388 struction, that effect should be given, if possible, to . every word contained in the instrument: and especially that words of common and settled signification should . nsiv’G their tulL iorce cind effect.
I will present another view of this part of the subject. The covenant can be extended to the claims of the children as purchasers under the will of John Hoomes the elder, only, I presume, by construing the word “ heirs” as “ children.” The word “ heirs” as referring to Richard Hoomes &c., occurs twice in that part of the covenant now under consideration. Where it first occurs, it clearly is used in its strict and primary sense, and does not mean “ children.” The covenantors bind themselves and their “heirs.” If the word in this connection be not construed in its strict and primary sense, then there is nothing in the covenant to bind the heirs, whether they have assets by descent or not. The same word where it again occurs in the same sentence ought to receive the same construction; at least without very strong reasons for giving it a different one; and none such appear in this case.
I think therefore it may fairly be concluded that the former branch of the clause before quoted, construed by itself, contains no more than a covenant of special warranty against the claims of persons claiming under the covenantors. Let us now see whether it contains any thing more when construed in connection with the latter branch of the clause. That branch is separated from the former only by a comma, and is in these words :
“ And do relinquish and fully confirm to said S. A. Apperson all the right they or their heirs now have, or might or may hereafter have, to said land or any part thereof, to him and his heirs and assigns forever, free from the said John Hoomes &c. and their heirs and of all other persons in the world.”
If the words of this latter branch of the covenant were such as (taken alone) would be construed to *389 import a covenant of general warranty, they would not be so construed, taken in connection with the former branch of the covenant. Otherwise the two branches of the clause would be inconsistent with each other, and the former would contain a covenant of special, and the latter a covenant of general warranty. A deed should be construed according to the intention of the parties, as the same may be gathered from the whole instrument. It would be absurd to suppose that the covenantors intended to give a general warranty against all the world, after carefully giving a special warranty only against persons claiming under them in virtue of the will. All covenants of warranty have the same object, but to a greater or less extent; and the rule as laid down by Sugden in his Law of Yendors, vol. 2. p. 94, is that “ where restrictive words are inserted in the first of several covenants having the same object, they will be construed as extending to all the covenants, although they are distinct.” This rule is supported by the following authorities. Nervin v. Munns, 3 Lev. 46 ; Broughton v. Conway, Dyer’s R. 240; Browning v. Wright, 2 Bos. & Pul. 13; Foord v. Wilson, 4 Eng. C. L. R. 205 ; Nind v. Marshall, 5 Id. 95. In the last cited case some of the covenants were restrictive, but one of them was general against “all persons whatsoever.” Dallas, C. J. said, “ I think ‘ all persons whatsoever’ must be construed to mean persons of the description in the other covenants; that is persons claiming under the covenantor, or persons claiming under them ; and that they are in the nature of sweeping and comprehensive words, introduced to give the largest effect to the special words; reference being had to their special nature, and as such ranging under known rules of construction, and to be explained and applied as I have already stated.” The same might be said of the expression “ all other persons in the world,” if the words of the latter branch of the clause were such as, taken alone, would import a cove *390 nant of general warranty in the broadest sense of the term.
But suppose the latter branch of the clause, taken . , , _ . . alone, could be regarded as importing a general warranw^iat is the subject to which the warranty refers ? Is it the land itself,- or is it merely the right of the covenantors thereto ? Unquestionably the latter. “ And do relinquish and fully confirm to the said Apperson all the right &c. to said land,” are the words used. Richard Hoomes &c. were contingent devisees; they covenanted as contingent devisees; and they relinquished to the purchaser from John Hoomes the younger their right as contingent devisees. And if this relinquishment imports a covenant of general warranty, it is only of their right as contingent devisees. In Sweet v. Brown, 12 Metc. R. 175, A conveyed to B all his right, title and interest in and to certain real estate described by metes and bounds, with the usual covenants of seisin and warranty. It was held that the covenants were limited to the estate and interest of A in the granted premises ; and were not general covenants extending to the whole parcel described in the deed. In Allen v. Holton, 20 Pick. R. 458, a similar decision was made. See also Blanchard v. Brooks, 12 Pick. R. 47. If Richard Hoomes only warranted his right as contingent devisee, his warranty was of course not broken by the claim of his children to their rights as contingent devisees and purchasers under the will of their grandfather.
But does the latter branch of the clause import any covenant at all; or at least any covenant as separate and distinct from the covenant of special warranty contained in the former ? I rather think not. I think its only office was to shew that the relinquishment and confirmation were intended to be as full and complete as possible.
Whether therefore the two branches of the clause be construed separately or together, I think they import *391 no more than a covenant of special warranty on the part of Richard Hoomes against the claims of persons claiming under him. This construction, instead of being weakened, will be strengthened and confirmed if we look to the whole deed, to the situation of the parties, and the relation which they respectively bore to the subject of the conveyance. It is not pretended that Richard Hoomes participated in any way whatever in the consideration which was paid for the land. He seems to have had no interest in the sale. He had a contingent interest in the land, which he was willing to relinquish to the purchaser; and he was willing also to warrant the land against all persons claiming under him as contingent devisee. He therefore joined in the execution of a deed, containing such a relinquishment and covenant expressed in words as apt and suitable as any that could have been used to express them. Would it be reasonable to depart from the strict and primary sense of these words and place upon them a strained construction, for the purpose of making him relinquish, not only his own contingent right, but also the contingent rights of others ,• and covenant, not only against all persons claiming under him, but also against his children claiming as purchasers under their grandfather, and even against the whole world ? It was an act of liberality on his part to have relinquished his own right without consideration. While he was willing to do that, he might not have been willing, and probably was not willing, to relinquish the rights of others or incur a personal liability, on account of rights over which he had no control. An intention to make a relinquishment or incur a liability so extensive should be plainly expressed. If the words used are equivocal, and import, at least as strongly, a more limited and reasonable intention, they should be construed according to such latter intention. In this case we have seen that they import more strongly, if not plainly, an intention on *392 the part of Richard Hoomes only to relinquish his own rights, and covenant against persons claiming under him.
It is probakie that when Richard Hoomes executed the deed, he had no idea that his children could have any claim as purchasers under their grandfather’s will; but supposed, if he thought at all on the subject, that, in the event which has happened, they could only claim by descent from him. If he had then supposed that they would be entitled as purchasers in the event that has happened; and had intended to relinquish their right, or rather to covenant against it, he would have expressed his intention in plain language, and not in words which import an intention only to relinquish his own right, and to covenant against persons claiming under him. The fact that he has used such words, I think conclusively shews that he intended only to relinquish his own right, and to covenant against persons claiming under him: and that, whether he supposed, or did not suppose, that his children would be entitled as purchasers in the event that has happened. If he so supposed, we have already seen that he would have used different language to have relinquished their right or covenanted against it. If he did not so suppose, then of course he only intended to relinquish his own right, and to covenant against persons claiming under him; for, not being aware of any right of his children, he could not have intended to relinquish or covenant against it. And considering himself the proprietor of the right which this Court has since decided to be theirs, he must have considered the relinquishment of his own right and covenant against persons claiming under him as covering the whole ground.
Suppposing that Richard Hoomes when he executed the deed was not aware of the right of his children; whether or not he would have covenanted against it if he had been aware of it,, is matter of conjecture mere *393 Iy, and can have no influence in the decision of the ,. . , . , question we are now endeavouring to solve; which is, whether he did actually covenant against it.
It has been argued with some force that John Hoomes the vendor, having joined in the same covenant with the contingent devisees, it cannot be restricted as to the latter without being also restricted as to the former: which, it is thought, would be unreasonable. It does not, I think, follow as a necessary consequence, that because the covenant of the vendor and contingent devisees is contained in the same clause, or even in the same words, it must therefore have the same extent as to both. Suppose, for example, that the latter part of the clause before quoted could be considered as importing a general warranty. Redendo singula singulis, the vendor having conveyed the estate itself might be considered as intending to warrant the estate itself, while the contingent devisees having only relinquished their right as such, might be considered as intending to warrant only that right. But without deciding whether the covenant of warranty on the part of the vendor was general or special, I do not admit that an intention on his part to give a special covenant only would have been unreasonable; nor, if it would, that that consideration can have much, if any, effect on the construction of the covenant on the part of the contingent devisees. In England the covenants of the vendor are generally of a restricted nature. Lord Eldon, in Browning v. Wright, 2 Bos. & Pul. 23, thus describes the common course of business in such a case. “ An abstract is laid before the purchaser’s counsel; and though to a certain extent he relies on the vendor’s covenants, still his chief attention is directed to ascertaining what is the estate, and how far it is supported by the title. The purchaser therefore not being misled by the vendor, makes up his mind whether he will complete his bargain or not, and if any doubts arise on the *394 title, it rests with the vendor to determine whether he will satisfy those doubts by covenants more or less extensive. Prima fade therefore in the conveyance of . an estate, we are led to expect no other covenants than ^0313 which guard against the acts of the vendor and his heirs.” In Virginia the practice is different; and while, on the one hand, less attention is directed to the title than in England; so, on the other, a covenant of general warranty is usually required and given. Such a covenant seems not to be entitled to the importance which is attached to it by our practice; and it would doubtless be better, as in England, to pay more attention to the title, if not to attach less importance to a general warranty. But why in this case should a covenant of general warranty have been given? It was known both to vendor and vendee that the title of the former was not absolute. The vendor claimed under a will which was exhibited to the vendee, and under which his estate was subject to be defeated by his death without issue. Now, whether he intended to sell precisely such estate as he had, or to sell and warrant a greater estate than he had, was matter of contract between the parties: Prima fade, a vendor intends only to sell such estate as he has, where his estate is of a limited nature, or subject to a contingency. In this case the vendee might choose to run the risk of losing the estate in the event of the vendor’s dying without issue, receiving of course an equivalent in an abatement of the price; rather than pay the price of the absolute estate, and rely on the covenant of the vendor for his indemnity. Unless the vendor had other estate than that devised to him by his father, his covenant of general warranty would have afforded little or no indemnity against the claim of the contingent devisees ; for the same contingency which would occasion a breach of his covenant would deprive him of the means of paying damages therefor. The vendee would *395 place little or no reliance on the covenant of the vendor as a means of indemnity in such a case, and unless the contingent devisees would join in the deed, would of course require an abatement of the price. The contingent devisees did not all join in the deed, and to the extent of the interests of those that did not join, a proportionable abatement was doubtless made. Whether any abatement was made on account of the contingent interest of the children of Richard Hoomes does not appear. Probably not, because probably no such contingent interest was known to exist. But if no such interest was known to exist, it is on that account more probable that the vendee relied on the relinquishment and covenant of Richard Hoomes, than on any covenant of John Hoomes to protect him against an interest which he then supposed to be vested entirely in Richard Hoomes. In this case therefore a special covenant on the part of John Hoomes would at least not have been unreasonable. But even if it would, it certainly would not have been more fo than a general covenant on the part of Richard Hoomes.
I am therefore of opinion that the covenant of Richard Hoomes has not been broken; and if the other, or even one of the other, Judges agreed with me in this opinion it would be unnecessary for me to say anything more; but as that is not the case, I must now proceed to examine and consider the other questions.
2d. Did the covenant run with the land; or has Dickinson the assignee of the land a right of action for a breach of the covenant ?
It is a general rule of the common law that dioses in action are not assignable. But to this general rule there are exceptions, one of which is, that covenants running with land pass with the land to the assignee thereof. Of the covenants usually contained in a conveyance of land, some run with the land and some do not. Those which are broken, if at all, at the instant *396 of their being made, such as the covenant of seisin, of right to convey, or against incumbrances, do not run with the land ; while those which may be broken after-wards, such as the covenant of warranty, for quiet enjoyment, or for further assurance, do run with the land. But even the latter, when broken, cease to run with the land from the time they are broken; for a broken covenant is a mere chose in action, which by the common law is not assignable; being no longer inherent in the land, which alone gives to the covenant its assignable quality. The covenant of Richard Hoomes was a covenant of warranty, and was not broken at the time of the assignment of the land to Dickinson; it therefore passed with the land to him, unless prevented from so passing by the objection that the estate conveyed to him was insufficient to support the covenant, or the objection that no estate at all passed to him from Richard Hoomes the covenantor. Let us first examine the objection, if in fact such an objection can be considered as having been made, that the estate conveyed to Dickinson was insufficient to support the covenant of warranty even on the part of John Hoomes, the grantor of the estate. That it is necessary that some estate should be vested in the covenantee to make a covenant of warranty effectual even between the contracting parties, is undoubtedly true, and results from the very nature of that covenant. The covenants of seisin and of right to Convey, are effectual covenants; though no estate be vested in the covenantee; because they are broken, if at all, at the instant of their being made, without any further act or default of the covenantor. But the covenant of warranty and of quiet enjoyment, which are the same in effect, can only be broken by an eviction or ouster by title paramount. They therefore presuppose the possession of an estate by the covenantee, and of course cannot be effectual where no such possession has passed to him. A deed *397 purporting to convey land which is in the adverse possession of a third person, will not only not support a covenant of warranty, but is altogether null and void. But if the grantor be in possession of the land at the time of the execution of the deed, his possession and his estate, whatever it may be, will pass to the grantee, and will support a covenant of warranty contained in the deed. This distinction is well illustrated by the case of Slater v. Rawson, 1 Metc. R. 450, and again in 6 Metc. 439. By the deed, in which a covenant of general warranty was contained, in that case a tract of land containing 130 acres was conveyed by metes and bounds. A man named Jacobs had a title paramount to 22 acres of the land, which was therefore yielded up to him by the assignee of the land; who thereupon brought an action on the covenant of warranty. The defendant contended that he was never seised of the land in controversy, and that therefore nothing passed by his deed. A verdict was rendered for the plaintiff on a question reserved by the Judge. The Supreme court awarded a new trial. Dewey, J. in delivering the opinion of the Court, after stating that the defendant at the time of making his conveyance had no legal title to the 22 acres of land, proceeds to enquire whether the defendant was seised in fact, and uses the following language: “ The case as stated by the parties, in the report, finds that the premises, which are the subject of this controversy, were a part of a large tract of wood land unenclosed by fences, and of which there had been no actual occupation by any of the parties. Taking these facts to be correctly stated, there was clearly no seisin in fact in the defendant acquired by an entry and adverse possession. The rule as to lands that are vacant and unoccupied, that the legal seisin follows the title, seems to be applicable here; and having ascertained in whom is the legal title, that also determines in whom the seisin is.” “ The covenant of warranty *398 is wholly ineffectual, as no land passed to which it could be annexed; and the result therefore from this Anew of the case, is that the plaintiff cannot maintain ' his action.” 1 Metc. It. 456-7. On the new trial evidence was offered to prove that the defendant and his 1 father under whom he claimed, had exercised acts of ownership on the land, and that he was in fact seised and possessed thereof at the time of the execution of the deed. A verdict Avas rendered for the plaintiff as before, subject to the opinion of the Supreme court. That Court rendered judgment on the verdict. Wilde, J. in delivering the opinion of the Court, after reviewing the evidence, says: “ It therefore clearly appears by the evidence that the defendant at the time of his conveyance, had the actual possession of the premises, and that he had a valid title against all the world, except the true owner of the Jacobs lot. If any other person had entered on the land in dispute, he might have maintained trespass against him; or if he had been ousted he might have maintained a writ of entry. But the defendant’s counsel contend that although he had possession of the land in dispute, yet he had not such a possession as Avould amount to a disseisin of Jacobs, who afterwards entered on the premises and ousted the plantiffs; and therefore that the defendant was never actually seised of the land in dispute, and that no title thereto passed by his deed to the grantees; so that the covenant of warranty could not run with the land and pass to their assignees.” The learned Judge after making several observations and citing various authorities relating to the legal difference between seisin and possession, further says : “ It is not necessary however in the present case to decide the question Avhether there is any legal distinction between the words seisin and possession ; for if the defendant Avas in possession when he conveyed, &c., claiming to hold the whole land conveyed, he had a good right to convey his title *399 whatever it was. His estate passed by his deed to the grantees, and all his covenants were binding.” “It is universally true that a party in possession of land, claiming title, may make a legal conveyance, and his title by possession will pass to his grantee. Actual possession of property gives a good title against a stranger having no title.”
In Beddoe v. Wadsworth, 21 Wend. R. 120, the Supreme court of New York decided that “an assignee of covenants of warranty and for quiet enjoyment may maintain an action on the covenants where possession is taken under the deed and there is a subsequent eviction, although at the time of the execution of the deed the grantor had no title.” To the same effect also is the case of Fowler v. Poling, 2 Barb. R. 300, and 6 Barb. R. 165.
If a covenant of warranty contained in a deed executed by a person in possession of land did not run with the land, where there is an outstanding paramount title, the most serious inconveniences would follow. The covenant of warranty is the only covenant inserted in many, if not most, of the deeds that are executed in this country, and according to the general understanding of our people it runs with the land, and may be resorted to for the indemnity of the holder whenever he is evicted by title paramount. As I have already had occasion to remark, more attention is paid to the covenant of warranty and less to the title with us than in England. A purchaser is often satisfied without looking further into title, when he finds that several of the deeds under which he claims contain the covenants of warranty of persons, in the continuance of whose responsibility he has perfect confidence. But of what value would be these covenants if an outstanding paramount title would render them ineffectual ? They could only be broken by an eviction or ouster by title paramount; and yet the very existence of such an out *400 standing title would render the covenant ineffectual! So far from affording any protection to the assignee, they would afford none even to the covenantee. In some cases they might be of benefit, as for instance w^ere an actual disseisin of the rightful ower by the grantor could be proved. But this limitation would so curtail the operation of the covenant, and throw so much doubt and difficulty over it as to render it of little value.
I think therefore that reason and authority unite in shewing that whenever the deed passes the possession the covenant of wS-ranty is effectual and runs with the land.
The case of Randolph v. Kinney, 3 Rand. 394, is not in conflict, but in accordance, with the distinction I have referred to. In that case all the parties claimed under Stuart who was the proprietor of 331 acres of land. In 1748 Stuart conveyed 57 acres of the land to James Miller. In 1763 Stuart conveyed the whole 331 acres to John Miller; thus including the 57 acres he had before eonveyed to James Miller. In 1784 John Miller conveyed 'the whole 331 acres to Randolph, who in 1808 conveyed it to Kinney. Judge Carr in his opinion, in which the other Judges concurred, uses the following language : “ Those claiming the 57 acre tract under the deed of 1748 from Stuart to James Miller, were in possession by virtue of that conveyance. The subsequent deed therefore from Stuart to John Miller for the whole tract, although it included these 57 acres, could pass neither the possession nor the title ; and as Miller had neither possession nor title to these 57 acres, he could convey neither to Randolph, nor Randolph to Kinney. The clauses of general warranty in the deeds from Stuart to John Miller and from Randolph to Kinney, could not operate as real covenants, unless the vendees entered; and could pass to the assignee only along with the land and as *401 incident to it. But here the land not passing, the warranty could not pass. A disseisor may convey and warrant the land ; for there may be a fee simple in a disseisor. But a person against whom there is an adversary possession, cannot make a warranty which will pass to an assignee, because he cannot convey.” Thus it is manifest that the opinion of Judge Carr, that the warranty in that case was ineffectual was based entirely on the fact that the possession of:! the land in controversy at the time of the conveyance, was adversary, and therefore did not pass to the grantee.
If a covenant of warranty contened in a conveyance from a person in possession but without title, is effectual and will run with the land, it would seem, a fortiori, that where the grantor is not only in possession but has a title to the land, though not such a title as is conveyed and warranted to the purchaser; the covenant of warranty will be effectual and will run with the land. On this subject see the notes of the American editor to Smith’s Leading Cases, 43 Law Lib., p. 122, citing the case of Balley v. Wells, 3 Wils. P. 36. The case of Andrew v. Pearce, 4 Bos. & Pul. 158, might seem at first view to be a contrary decision. But in that case the lease for years by a tenant in tail had become void by the termination of the estate in tail, and after it had thus become void it was assigned to the plaintiff. The land was not conveyed, but the lease was assigned to the assignee. And Sir James Mansfield, Ch. J. said : “ The lease is stated to have become absolutely void by the death of Peter Best, without heir male. The lease then having become absolutely void, what could be the operation of the assignment by Bennett to Andrew ? He could neither assign the lease nor any interest under it, because the lease was gone. What right of any sort had Bennett ? If any thing it could only be a right of ac *402 tion on the covenant, and that could not be assigned by law” &c. Now in the case under consideration, John Hoomes the younger at the time of his conveyance, was seised of an estate in fee though defeasible; and he conveyed an estate in fee simple with covenant of warranty. So far therefore as John Hoomes the grantor of the estate is concerned, it seems to be as strong a case as well could be to make a covenant of warranty effectual, and run with the land.
But it is objected that the covenant under consideration was made by Richard Hoomes, and that no estate passed from him to the covenantee. Let us now examine this objection, which was chiefly relied on in the argument. It can hardly be said that no estate passed from Richard Hoomes; or at all events, that he was a stranger to the subject matter of the contract and the conveyance. He had in fact an interest in the subject ; an interest which depended on the double contingency of John’s dying without issue living at his death, and of Richard’s surviving him. The parties doubtless supposed that his interest was even greater than it was, and that it depended on the single contingency of John’s dying without issue living at his death. This Court however has decided that his interest depended on the double contingency aforesaid. 1 Gratt. p. 302. If that double contingency had occurred, the deed would have operated, at least by estoppel, to pass the interest of Richard Hoomes to the purchaser, and the covenant would then undoubtedly have run with the land. But as John was seised of the estate in fee, and conveyed it with covenant of warranty, Richard’s joining in the deed was a confirmation of the conveyance, so far as he was concerned; and if it be necessary, to make a covenant run with the land, that some estate should pass from the covenantor to the covenantee, I think it might well be contended that this case comes up to the requisition.
*403 But is it necessary that some estate should pass from the covenantor to the covenantee in order that the covenant may run with the land ? I think not. In the notes of the learned English annotator to Spencer's Case, 43 Law Lib., p. 99, he says, “ where such a covenant, (that is a covenant for something relating to the land,) is made, it seems to be of no consequence whether the covenantor be the person who conveyed the land to the covenantee, or be a mere stranger. Thus in the Prior's Case reported in the text, and in Co. Litt. 384 b, the Prior was a stranger to the land of the covenantee ; and there is a good reason for this assigned in the above passage in Co. Litt., where the law is said to be so, to give damages to the party grieved ; in other-words, in order that the person who is injured by the non-performance of the covenant, who is always the owner of the land pro tempore, may be also the person entitled to the remedy upon it by action.” But while on the one hand it seems that the benefit of a covenant runs with the land, though the covenantor be a stranger to the land ; so,' on the other, it would seem that the burden of a covenant in no case runs with the land ; in no case, I mean, in which the relation of landlord and tenant is not created by the deed. In regard to covenants entered into by the owners of land, the same learned annotator says: “great doubt exists whether these in any case run with the lands so as to bind the assignees of the covenantor. One inconvenience which would be the result of holding them to do so is, that the assignee would frequently find himself liable to contracts of the very existence of which he was ignorant, and which perhaps would have deterred him from accepting a conveyance of the land, if he had known of them; and the reason assigned in the first Institute for-allowing the benefit of a covenant relating to the land to run therewith, viz: to give the remedy to the party grieved, does not apply to the question respecting the *404 burden thereof.” Id. p. 101. See also the notes of the American annotator. Id. p. 137. The law is laid down to the same effect in 2 Lomax’s Dig., p. 260, § 29, 30, 31. The principle thus stated by these profound jur’sts *8 °PPosed by no authority I have met with, and is most consonant with reason and conscience. There may have been good reason under the feudal constitution for requiring that the warranty should accompany the estate and exist only between the donor and donee. But the technical warranty which formerly existed has been altogether disused, if not abolished; and its place is now supplied by covenants, which better suit the present condition of things. I can see no reason why these covenants, if in their nature they are such as can run with the land, should not run with the land as well when they are made by a stranger as when they are made by the donor; but I can see many reasons for the contrary. A person may be willing to purchase land notwithstanding a flaw in the title, if he can fortify it by proper covenants. The owner may not be sufficiently responsible, but may be able to procure the assistance of responsible friends, or creditors, or others may have sufficient interest to join him in the covenants. But rvhat would these covenants be worth if they could not be enforced by an assignee of the land ? A covenant of seisin, or of right to convey, would never be given, in such a ease, because it would be known to the parties that as soon as made it Avould be ipso facto broken. A covenant of warranty, or for quiet enjoyment, would be the most appropriate covenant for such a case ; and yet, to make that covenant effectual, it would be necessary, according to the doctrine contended for, that the covenantee should always retain the property.
I am therefore of opinion that the covenant of Richard Hoomes runs with the land even though he should be considered as a stranger to the land. It is perhaps proper that I should express the opinion I entertain, that *405 even if the covenant did not run with the land, an assignee would have a right to enforce it for his benefit in the name of the covenantee. “ Where the covenants entered into with a purchaser are covenants in gross, and he afterwards sells, the purchaser from him, being entitled to the benefit of the former covenants, can compel him to allow his name to be used for the purpose of enforcing the covenants.” This is the language of Sir Edward Sugden, 2 Sug. on Vend. 726; and the authority he cites for it, is Riddell v. Riddell, 10 Cond. Eng. Ch. R. 183. I am also of opinion that if there be an unbroken chain of covenants of the same kind running through all the mesne conveyances, even though they be not covenants running with the land, a Court of equity will give the assignee the benefit of any of the remoter ones. “ A Court of equity will make the party immediately liable, who is or may be, at law or in equity, made ultimately liable. Thus, for example, if a chose in action not negotiable at all, or not negotiable by the local law, except to create a legal right of action between the immediate debtor or endorser and his immediate endorser or assignee, should be passed to a remote assignee or endorsee, the latter would be entitled in equity directly to sue the party who was ultimately or circuitously liable for the debt to the antecedent holder or creditor.” This is the language of Story, 2 Equ. Jur. § 1250 ; and the authority he cites in illustration of it, is the case of Riddle v. Mandeville, 5 Cranch’s R. 322. See also 43 Law Library, p. 122, and 0 the case there cited of Nesbit v. Brown, 1 Dev. Eq. R. 30. This equitable doctrine is not opposed by the case of Randolph v. Kinney, 3 Rand. 394. In that case there was not an unbroken chain of covenants of the same kind. The only covenant which appears to have been contained in the deed to Randolph, who asserted the equity, was a covenant for quiet enjoyment. And that was never of any effect, because the land in con *406 troversy never came to the possession of Randolph, but ... .... remained in the adversary possession or another, m whose possession it was when conveyed to Randolph. ", 1 here was then no starting point; no foundation for ^ equity to rest upon.
But it is Said that only a portion, though much the greater portion, of the land conveyed by John Hoomes the younger to Apperson, was conveyed by the latter to Dickinson; and one of the learned counsel for the appellees relies on a defence, which he admits to be technical, and for which no authority is to be found except in a work of Preston, viz: that a covenant cannot be apportioned. That writer, who, as the counsel properly says, is a very great authority, does certainly say that “ when the property is subdivided by sales it seems to follow from a maxim in law that the purchasers lose the benefit of the former covenants, on the ground that the remedy cannot be apportioned; or, in more correct terms, the covenantor cannot be subjected to several actions. Thus when a man sells two farms to A and covenants with him, his heirs and assigns, and one of these farms is sold by A to B, B can never sue on this covenant, since it would subject the covenantor to several actions.” 3 Preston Abstr. 56, 58; 2 Lomax 263, 4, note. But as one of the learned counsel for the appellants properly remarked, Preston seems to contradict this position in another part of his work, when he says that covenants which run with the land are not extinguished by apportionment of the land into parcels among several purchasers and owners. The position is not only un- , supported by any other authority than that of Preston, but is opposed by an array of authority no less imposing than his. Sugden, after quoting the observation of Preston, says: “ The better opinion however seems to be, that an alienee of one of the estates could maintain covenant against the covenantor where the covenants run with the land.” It does not seem that any injus *407 tice would arise by suffering several covenants to lie, al- . , , . . . though it might expose the covenantor to inconvenience; whereas the denial of the right to each assignee might , , ..... . lead to positive injustice, or, if not, to greater inconvenience on their part.” 2 Sug. on Tend. 743, pi. 91, 92. See also Kane v. Sanger, 14 John. R. 89, and authorities cited; Van Horne v. Crain, 1 Paige’s R. 455; Astor v. Miller, 2 Paige’s R. 68. It is true, as a general principle of law, that covenants are not apportionable; aud so also is it true, as a general principle of law, that covenants are not assignable. But as covenants which run with land are assignable, because the land itself is assignable, so also, it would seem that covenants which run with land are apportionable because the land itself is apportionable. A covenant running with land would be of very little value if it ceased to run with the land whenever the land was divided, whether by act of law or by the act of the owner. We know that covenants for the payment of rent are apportionable, both by act of law and by the acts of parties. 8 Bac. Abr., Rent. M. And for the same reason why may not other covenants be apportioned ? The rule of law that covenants are not apportionable is founded on convenience. But injustice is a greater evil than inconvenience. And wherever justice, or even greater convenience, requires that a covenant should be apportioned, it would seem to be reasonable that the general rule should bend and admit of an exception.
3dly. I come now to the consideration of the question, “ whether lands descended in Kentucky could be regarded as assets by descent in any proceeding in Virginia ?”
“ Freehold land of inheritance, descended to a person’s heir at law is, by the common law, assets for the payment of the ancestor’s debts by specialty, as by bond or covenant, in which his heirs are bound.” Ram on Assets 214, 8 Law Library 144. The common law in *408 this respect was the law of Virginia, when it embraced the territory which now constitutes the State of Kentucky. It has been the policy of all or nearly all the states of the Union to extend, and not to restrict, the of land for the payment of debts. While in our own state that policy has not progressed so rapidly as in some of the other, and especially in most of the western states, it has at length reached the point of subjecting an intestate’s land to the payment of all his debts. In the absence therefore of all evidence on the subject it would be presumable, that in Kentucky land is liable for the payment of debts, at least to the extent to which it is liable at the common law; especially if that liability sought to be enforced by the bill should not be denied by the answer. But in this case it is proved affirmatively by John C. Herndon, a lawyer of that state, that by the law of that state, which existed in 1823 when Richard Hoomes died, and has ever since existed, freehold land of inheritance descending from an intestate “ can be subjected to the payment of the intestate’s debts either by proceedings in law or chancery.” It is also proved by him that as early as 1798 an aet was passed, which is still in force in that state, containing a provision similar to 1 Rev. Code, ch. 99, § 21, that “ if the deed of the alienor doth mention that he and his heirs be bound to warranty, and if any heritage descend to the demandant of the side of the alienor, then he shall be bound for the value of the heritage that is to him descended” <fcc. This last provision having been the law of Virginia when Kentucky was organized as an independent state, the probability is that it never ceased for a moment to be the law of the latter state, and that the said act of 1798 was merely a continuation or re-enactment of an existing law. Without any proof of such re-enactment it would have been fair to presume that the provision continued to exist as a part of the Kentucky law. It is contended by one *409 of the counsel for the appellees, that the Kentucky laws in question being statute laws, the evidence of Herndon is inadmissible; no foundation having been laid for its introduction as secondary evidence, by proof of inability to obtain copies of the statutes. The citation from Story’s Conflict of Laws, § 637, 641, certainly gives support to the position that as a general rule a foreign statute law must be proved by an authentic copy if to be had. The Courts of some of the states, and the Supreme court of the United States, are of opinion, “ that the connexion, intercourse and constitutional ties which bind together these several states, require some relaxation of the strictness of this rule,” and “ have accordingly held that a printed volume purporting on the face of it to contain the laws of a sister state is admissible as prima facie evidence, to prove the statute laws of that state.” 1 Greenl. Ev. § 489, and cases cited in note 2, among which is the case of Taylor v. Bank of Alexandria, 5 Leigh 471.' But I incline to think that the doctrine of primary and secondary evidence does not apply to the case, and that a foreign law, whether written or unwritten, may be proved by a person who is learned in that law, without laying any foundation for the introduction of secondary evidence. This is the principle of a late decision of the Court of Queen’s Bench, cited by one of the counsel for the appellants from 55 Eng. C. L. It. 250, 267. As was said by one of the Judges in that case, “ the general principle does not seem to apply to the case. What, in truth, is it that we ask the witness ? Not to tell us what the written law states; but, generally, what the law is. The question is not as to the language of the written law: For when that language is before us we have no means by which we are to construe it.” “ How many errors might result if a foreign Court attempted to collect the law from the language of some of our statutes which declare instruments in particular cases to be null *410 and void to all intents and purposes, while an English , . _ _ , , lawyer would state that they are good against the grantor, and that the Courts have so expounded the staIt is no answer to say that other evidence by . tutes! wor(j 0f mouth may be added for the purpose of giving the interpretation of the written law. I am merely shewing that our Courts require, not the actual written words of a foreign law, but the law itself; for which purpose a professional witness is required to expound it.” But the evidence of Herndon not having been objected to in the Court below, (in which case authenticated copies of the statutes might have been exhibited,) it would seem to be too late to make the objection in this Court.
Whether therefore we look to the evidence of Herndon or not, I think it must be regarded as the law of Kentucky, that any land in that state which may have descended from Richard Hoomes to his heirs at law, is assets for the payment of what may be due upon his covenant of warranty in this case ; and that if the land to which the covenant is annexed were situate in the State of Kentucky, the heirs of the covenantor, in an action brought by them to recover that land, would be barred for the value of the land to them descended.
But the land to which the covenant is annexed being situate, and the suit for its recovery by the heirs of the covenantor being brought, in Virginia; the question is, whether the land descended to them in Kentucky is assets, and whether they ought to be bound for the value of the said land descended to them, at least to the extent to which it has actually come to their hands.
I think this question should be answered in the affirmative. It is undoubtedly true that real estate, or immovable property, is exclusively subject to the laws of the government within whose territory it is situate; and that no writ of sequestration or execution, or any order, judgment or decree of a foreign Court, can be en *411 forced against it. But I think it is no less true “ that equity, as it acts primarily in personam, and not merely ira rem, may, where a person against whom relief is sought is within the jurisdiction, make a decree upon the ground of a contract, or any equity subsisting between the parties respecting property situated out of the jurisdiction. In this very language the principle is stated by White and Tudor in their notes to leading equity cases, Law Library, May 1851, p. 319; and the authorities to which they and the American editors refer, seem fully to sustain the principle.
In the case of Massie v. Watts, 6 Cranch’s R. 148, Marshall, Ch. J. reviews the principal cases, commencing with the celebrated case of Penn v. Lord Baltimore, 1 Ves. sr. 444; and concludes, “upon the authority of these cases, and of others which are to be found in the books, as well as upon general principles, that in a case of fraud, of trust, or of contract, the jurisdiction of a Court of chancery is sustainable wherever the person may be found, although lands not within the jurisdiction of that Court may be affected by the decree.” “ The circumstance,” to use his language in another part of the case, “that a question of title may be involved in the enquiry, and may even constitute the essential point on which the case depends, does not seem sufficient to arrest that jurisdiction.” In the case of Mitchell v. Burch, 2 Paige’s R. 615, the Chancellor says: “ Although the property of a defendant is beyond the reach of the Court, so that it can neither be sequestered or taken in execution, the Court does not lose its jurisdiction in relation to that property, provided the person of the defendant is within the jurisdiction. By the ordinary course of proceeding, the defendant may be compelled either to bring the property in dispute, or to which the complainant claims an equitable title, within the jurisdiction of the Court; or to execute such a conveyance or transfer thereof as will be sufficient to vest the legal *412 title, as well as the possession of the property, according t0 the lex loci rei siten. See also Mead v. Merrit, Id. 404. These principles have been recognized in Virgifar as we ^a7e ha(j any adjudications on the subject. In the case of Farley v. Shippen, Wythe’s R. 135, Chancellor Wythe decreed that the defendants who resided in Virginia, were trustees for the benefit of the plaintiffs of certain lands in North Carolina, and should convey the same to them. “ If,” said the Chancellor in that case, “ an act performed by a party in Virginia, who ought to perform it, will be effectual to convey land in North Carolina, why may not a Court of equity in Virginia decree that party, regularly brought before that tribunal to perform the act ? Some of the defendant’s counsel supposed that such a decree would be deemed by our brethren of North Carolina an invasion of their sovereignty. To this shall be allowed the force of a good objection, if those who urge it will prove that the sovereignty of that state will be violated by the Virginia Court of equity decreeing a party within its jurisdiction to perform an act there, which act voluntarily performed any where, would not be such a violation. The defendant’s counsel objected also, that the Court cannot, in execution of its decree, award a writ of sequestration against the lands in North Carolina, because its precepts are not authorities there. But this, which is admitted to be true, doth not prove that the Court cannot make the decree; because, although it cannot award such a writ of sequestration, it hath power confessedly to award an attachment for contempt in refusing to perform the decree.” In Guerrant v. Fowler, 1 Hen. & Munf. 5, Chancellor Taylor approved the principles of the case of Farley v. Shippen, and decreed accordingly.
Immovable property being subject to the laws of the government within whose territory it is situate, the question whether and to what extent it is liable to the *413 claims of a plaintiff must of course be determined according to those laws. Therefore, where the suit is brought in a country different from that in which the property is situate, the Court in giving relief, must to that extent administer foreign law. This may be an inconvenience, but it is no objection to the jurisdiction of the Court, and is preferable to that failure of justice which would arise from a refusal to interfere in such cases. Courts, in the administration of justice, are in many cases, bound to execute foreign laws. Where a suit is brought in one country on a contract made in another, the lex loci contractus governs the case. Where a citizen of one country dies leaving personal property in another, the lex domicilii governs the succession and distribution of the property. In the latter case the domiciliary administrator cannot recover property situated out of the limits of the jurisdiction from which he derived his appointment. An auxiliary administrator must be appointed by the jurisdiction in whose limits the property is situate; and he is responsible for the property, not to the domiciliary administrator, but directly to creditors, legatees and distributees. In a suit brought by legatees or distributees to enforce that responsibility, the lex domicilii must be ascertained and administered by the Court. Harvey v. Richards, 1 Mason’s R. 381, was such a suit, and in it the law of Bengal, which was the place of the domicil, was ascertained and administered.
An heir who has assets by descent, which are liable by the lex loci, to the payment of the ancestor’s debts, may be considered to the extent of the assets, as a debtor by contract to the creditors, and also as a trustee of the subject for their benefit. His case therefore, as well upon the ground of trust as of contract, seems to be embraced by the principle as laid down by the Chief Justice in Massie v. Watts, “that in a case of fraud, of trust, or of contract, the jurisdiction of a Court of chan *414 eery is sustainable wherever the person may be found, although lands not within the jurisdiction of that Court, may be affected by the decree.” It is true the creditors have no lien upon the land descended; and a bona fide purchaser of it from the heir is entitled to hold it against the claims of creditors. But the heir was always bound in equity, and for a long time has been bound at law, to the extent of the purchase money. An heir in regard to the assets descended is as much a debtor by contract and a trustee for the benefit of the creditors whose claims bind the heirs, as an executor is in regard to the assets in his hands. In the case of Tunstall v. Pollard, 11 Leigh 1, it was decided by this Court that an executor having taken probat of the testator’s will and letters testamentary in England, and collected the assets of the testator’s estate there, and brought them with him to Virginia, but having never qualified as executor in Virginia, is liable to be sued by the legatees in the Court of chancery of Virginia for an account of his administration, and for the legacies that remain unpaid. There would seem to be less difficulty in maintaining a suit against an heir in respect of foreign assets, than a suit against a foreign executor, even in respect of assets brought with him to the country in which the suit is brought. An heir is a quasi personal debtor, liable to be sued in the debet and detinet. His obligation attaches to his person and follows him wherever he goes. The only difference between him and an ordinary debt- or, is the extent of his responsibility, which is limited not only by the nominal amount of the contract, but also by the value of the assets descended. He holds the assets in his own right, and as his own property. An executor on the other hand, acts under a commission, and is accountable to the jurisdiction from which he received it. It was contended with very great force in the case of Tunstall v. Pollard, that the executor is accountable exclusively to the jurisdiction *415 from which he receives his commission. But the Court overruled the objection. President Tucker in delivering an opinion in which a majority of the Court concurred, after admitting that the administration of the assets must be governed by foreign law, and repelling the objection arising from the difficulty of ascertaining that law, remarks: “ Whatever of difficulty or inconvenience may be fancied to exist in the execution of this duty, it weighs little in the balance in comparison with the burden which would be imposed upon creditors and distributees by refusing cognizance of their cases here, though the person and the property are both in our power, and sending them to sue in a foreign country from which the executor has absconded with the whole of the assets in his pocket. How shall they sue him there when he is not within the jurisdiction ? How shall they reach the assets there when he has eloigned them ?” p. 29. “ Upon the whole then it appears that in subjecting the executor to suit, who has brought the assets into this jurisdiction, no mischief will arise ; while the contrary doctrine will protect an executor (who quits the country where he administered and comes over to this country with the assets,) from all claim whatsoever. If he cannot be sued here he can be sued nowhere; since the foreign Court can have no longer power over him when his person and his effects are both beyond its reach.”
An heir cannot be sued at law in respect of foreign assets, because the writ of extendi facias, which is the only execution against the heir on a judgment at law, cannot be enforced extra territorium. But Courts of law and equity have concurrent jurisdiction of suits against heirs. And though some of the modem means, whereby adecree of a Court of equity may be enforced, can have no operation extra territorium, yet the ancient process of attachment may still be resorted to for the purpose of enforcing the performance of a decree; and will gen *416 erally be found effectual whenever the person who is to perform the decree is within the jurisdiction of the Court. The Court will give to thesuitorall the redress within its power, and will not be deterred from doing so by the consideration that it cannot act in rem as well as in personam. I think therefore a suit in equity may be maintained against the heir whenever his person is within the jurisdiction of the Court. Ordinarily, the Court in whose jurisdiction the defendant resides would be the most convenient Court for him; for, in the language of Chancellor Wythe in Farley v. Shippen, “a case can rarely if ever occur, the discussion of which can be so convenient to the defendant in any other, as in his own country.” But cases may sometimes occur in which, all things considered, it may be more convenient to turn over the parties to a foreign jurisdiction. The ancestor may reside and die abroad leaving all his family and estate in the place of his domicil. One of his heirs may remove to this country or be casually here, and be sued here for a debt binding the heirs. In such a case justice as well as convenience would require that the suit should be brought where most of the heirs reside, where the executor resides, where the prop-1 erty is situate, and where therefore the accounts can more conveniently be settled, the law which governs the case be better ascertained, and the decree be more effectually enforced. “ It may be admitted,” says Story, Justice, in the case of Harvey v. Richards, 1 Mason’s R. 381, 409, “that a Court of equity ought not to be the instrument of injustice, and that if, in the given case, such would be the effect of its interposition, it ought to withhold its arm. This however would be an objection, not to the general authority, but to the exercise of it under particular circumstances.” Under such circumstances the Court in the exercise of a sound discretion should dismiss a creditor’s bill against the heir without prejudice to any suit he may bring in the *417 place of the domicil. Bat on the other hand cases may . ..... ,. . , . occur m which justice as well as convenience would require the suit to be brought in the country in which the heirs reside; though the land sought to be affected is 'situated in another country. Nay, cases may occur in which there would be an absolute failure of justice if the suit were not so brought. Suppose the ancestor lives and dies in Yirginia leaving all his heirs here, and all his creditors here, and all his estate here except some wild lands in another state, and suppose the heirs sell these lands, receive the proceeds and bring them to Yirginia, could not a suit of equity be maintained in Yirginia by the creditors against the heirs? In the language of Story, J. in the case of Harvey v. Richards, “ The property is here, the parties are here, and the rule of distribution is fixed. What reason then exists, why the Court should not proceed to decree according to the rights of the parties ? Why should it send our own citizens to a foreign tribunal to seek that justice which it is in its own power to administer without injustice to any other person.” Indeed it may be said in language similar to that of Tucker, President, in Tunstall v. Pollard, “ If the heirs in the case supposed cannot be sued here, they can be sued nowhere; since the foreign Court can have no longer power over them when their persons and effects are both beyond its reach.” But suppose further that the heirs, having sold the lands and brought the proceeds here, bring a suit in equity in this state to recover land conveyed by their ancestor with covenant of warranty binding the heirs, could not the defendant in that suit defend himself by averring and shewing that the value of the land was already in the hands of the heirs in the form of money arising from the sale of lands in another state descended to them from the same ancestor and liable by the laws of that state for the payment of the ancestor’s debts ? It may be said that the cases supposed are extreme cases. *418 And yet they are very much like the case under consideration, if lands in Kentucky in fact descended from Richard Hoomes to his heirs at law; a question which will be presently considered. To say that because in some cases it might be inconvenient to exercise such a jurisdiction, it should therefore be exercised in no case whatever, would be to say that positive and certain injustice should be permitted to be done for the purpose of avoiding a possible inconvenience. The question whether the Court will give relief in any given case, is, in the language of Story, J. in Harvey v. Richards, “a matter, not of jurisdiction but of judicial discretion, depending upon the particular circumstances of each case.”
The exercise of such a jurisdiction would be no invasion of the sovereignty in whose jurisdiction the property is situate, and no violation or obstruction of its laws. On the contrary it would rather tend to execute and enforce those laws. Its object is to enforce a contract, or trust, or liability, created, or recognized, or permitted by those laws, against persons who are out of the limits of the jurisdiction where the property is situate. It supplies a remedy when otherwise there might be none, and is auxiliary, instead of adversary, to the foreign jurisdiction. No sovereignty would object to the exercise of such a jurisdiction. The citizens of that sovereignty might be deeply interested in its exercise. Suppose the ancestor dies in another state leaving his land, his heir and his creditors there ; and that the heir sells the land, receives the money and comes to our state to reside. Would our Court of equity deny relief to the creditors in such a case ? Would not national comity as well as justice require it to give such relief? And yet the motives and reasons for giving relief would be much stronger in a case in which the ancestor, heir and creditors all resided in our own country. If the sovereignty of the situs would not, as it could not, object to the exercise of jurisdiction by our Court in the former case, it certainly would not in the latter.
*419 Nor would the exercise of such a jurisdiction be apt to produce any conflict of authority between the tribunals of different states; or to expose the defendant to ..... - . i i i i ■ i -i • i a multiplicity or suits, or a double liability. As was well said by one of the counsel for the appellant, the heir may protect himself by his pleas, whether the land lies in Virginia or elsewhere; and where the land lies elsewhere a Court of equity will take especial care that he be not subjected to a double charge. That Court is armed with power, and it is its duty, to direct all proper accounts and enquiries, and use all precautions which may be necessary for the attainment of complete justice to all the parties. It professes in such a case, in good faith to administer the law of the situs. And the sovereignty of the situs will give full faith and credit to its judgments. In the case of Tunstall v. Pollard, the same objection of conflict of jurisdiction was made. But it was answered by the President in this way. “ It is said indeed that peradventure there might be a conflict between the decisions of the foreign Court and ours, and that between the two the executor might suffer. I think not. While this Court would be bound in its decision to conform to the law of the forum which granted administration, the foreign Court on its part would consider the party protected for what he is compelled to do by us. No Court it must be presumed, could ever charge an executor with a devastavit, because he has paid a debt decreed in invitum, by a foreign tribunal, although the domestic forum may consider the decree erroneous.” He then proceeds to shew by authority that this is the established principle of public law as recognized both in England and the United States. An heir who pays the debt of the ancestor binding the heir, is protected to the extent of such payment, and may plead it for his protection in any suit brought against him by another creditor of the ancestor. This he may do, even though the payment be *420 voluntary; and, a fortiori, he may do it if the pay- , . ... ment be made by compulsion. If the heir reside here. the suit must be brought here, in which case, of course, , t , _ _ , . our Courts would give the heir the benefit of his payment. But if the suit could be brought in a Court of the situs, such Court would give at least as much effect to a payment by compulsion as to a voluntary payment, and this would be sufficient for the protection of the heir.
There is then no danger in any case of any injury to the heir arising from a conflict of jurisdiction. But if there were any danger in any case, there can certainly be none in this, in which the ancestor and all the heirs always resided in Virginia ; in which the ancestor has been dead nearly thirty years; and in which it is not pretended in the answer of the heirs, that any suit has ever been brought in Kentucky to subject the assets descended from the ancestor to the payment of his debts; or that any creditor of the ancestor ever existed in that state. If it be said that there is a possibility of the existence of such a creditor, or the institution of such a suit, it is so bare and remote as not to be a feather in the scale against that positive injustice which would be inflicted on the appellant by compelling him to surrender land warranted to him by the ancestor, to heirs who are in possession of assets by descent from the same ancestor ; and to turn him over to the possibility of obtaining relief in Kentucky, where none of the heirs reside, and where now there may be no remaining assets.
The comity which authorizes, if not the necessity whieh requires, the exercise of such a jurisdiction in countries generally, applies with greatly increased force to the United States as among themselves. Their close political union; their local proximity to each other, and the frequent social and commercial intercourse of their inhabitants, render it absolutely necessary that the prin *421 ciples of comity among themselves should be carried to the fullest extent; while the similarity of their institutions and laws render it comparatively convenient and easy to enforce in one state a contract or trust governed by the laws of another. It may be said that, in some of the states, and especially of the new states, land has been made assets for the payment of all the debts of a decedent, and is subject to sale for that purpose by his personal representative, though the descent is not broken. This, so far from diminishing, increases the propriety of aifording equitable relief in other states, where the heir may be found by the creditors with the proceeds of the land in his pocket. The giving of such relief may involve the necessity of taking an account of the assets real and personal, and of the administration thereof by the foreign representative : but it no more involves that necessity where the real estate is placed on the footing of personal assets by the local law, than where it is liable as at common law : for the personal, being the primary fund for the payment of debts at common law, must be exhausted before the real estate can be taken for that purpose: so that an account of the personal estate must generally be taken before the common law liability of the real estate can be enforced. Indeed, where the real estate is placed entirely on the footing of personal assets, and subjected to primary liability, the necessity for the settlement of an account of the personal estate before the real can be taken, would seem to be thereby obviated. But the necessity for such a settlement where it exists, is no objection to the jurisdiction, but addresses itself entirely to the judicial discretion of the Court. It may be a reason for “declining to exercise the jurisdiction in particular cases,” but is no reason “ against the existence of the jurisdiction itself.” 1 Mason’s R. 414 and 15. As was said by the learned Judge in that case, in speaking of a kindred subject, whether the Court will *422 give relief or not, “ must depend on the circumstances °f each caseand it is incumbent on those who resist the giving of relief, “ to establish in the given case that it may work injustice or public mischief.” Id. 430. reverting to the policy which has prevailed in most if not all of the states to increase and facilitate the liability of real estate for the payment of debts, it would be strange indeed if it should be a fruit of that policy to discharge the heir from all liability for the ancestor’s debt, in a case in which the plainest equity requires that he should be made liable, and in which he might be made liable without the least injustice or the slightest inconvenience to any body in the world. I imagine that in no state of the Union is the estate of a decedent discharged from liability, merely because it has passed from the hands of the personal representative and reached the hands of heirs or distributees. I imagine that in every state, as at common law, the claims of creditors attach to the estate as a trust subject, and (though from necessity bona fide purchasers must acquire a good title,) follow it into the hands of heirs and distributees, and may be enforced wherever their persons are to be found, and the doctrines of the English chancery prevail.
Reason and authority are alike in favour of the jurisdiction of a Court of equity in such cases. While the general principle that that Court has jurisdiction over the person, wherever it may be found, to enforce a contract or a trust, though land in a foreign country may be affected thereby, is sustained by many cases, and is now a well settled doctrine of equity ; and while the case of an heir having in his hands foreign assets by descent, whether in the form of land or money, which by the contract of the ancestor and the law of the situs, are bound for the debts of the ancestor, is clearly within the reason of those cases and of that doctrine. I have yet seen no case ancient or modern, in which it *423 was decided that a Court of equity, having jurisdiction over the person of the heir, had no power to enforce such a liability. In the earlier ages of English equity law, before it was well defined and established on the broad basis of justice on which it now stands, there was a struggle between the common law lawyers and the equity lawyers, not on the particular question of the liability of an heir for foreign assets by descent; but on the general question of the jurisdiction of a Court of equity in personam, though the decree might indirectly affect land situated in a foreign country. The case of Arglasse v. Muschamp, 1 Vern. R. 75, decided in 1682, was a suit in equity to be relieved against a fraudulent conveyance of lands in Ireland. The defendant pleaded to the jurisdiction. The Lord Chancellor after saying, “ This is surely only a jest put upon the jurisdiction of this Court by the common lawyers ; for when you go about to bind the lands, and grant a sequestration to execute a decree, then they readily tell you that the authority of this Court is only to regulate a man’s conscience, and ought not to affect the estate, but that this Court must agere in personam only; and when, as in this case, you prosecute the person for a fraud, they tell you, you must not intermeddle here, because the fraud, though committed here, concerns lands that lie in Ireland, which makes the jurisdiction local; and so would wholly elude the jurisdiction of this Court overruled the plea, and ordered the defendant to pay costs “ for endeavouring to oust the Court of its jurisdiction.” The case of the Earl of Kildare v. Sir Morrice Eustace, Id. 419, cited by Mr. Barton, was a suit in equity to enforce a trust of lands in Ireland. Sir John Holt, the counsel for the plaintiff, maintained the jurisdiction of the Court. The defendant’s counsel “in a manner waived,” and thus conceded, “the preliminary point” of jurisdiction, “ and would not enter into the debate whether the Court might not decree *424 the trust of lands in Ireland, the trustee being in England.” But they insisted that it was certainly a matter discretionary in the Court, whether they would do it or not; and that as this case was circumstanced, they aPPrehen(!ed the Court would not interpose. And among the reasons assigned for not interposing in the case, were the following : “ 1st. That in this case there had been no less than two judgments in the Courts of law in Ireland, and no less than three bills in equity and “2dly. That Sir Morrice Eustice the trustee, did not live in England, but came here occasionally upon other business; and that it would be unreasonable to keep him from his own country and from all his other concerns, to attend this suit.” But the Court, consisting of the Lord Chancellor and the Judges, overruled the objection, and decided not only that the Court had jurisdiction of the case, but that it was a proper one for the exercise of its judicial discretion. It is true, as stated by Mr. Barton, that Sir John Holt, in arguing the case, said “ it was resolved in Evans & Ascough’s Case, Latch, fol. 234, and Dowdale’s Case, in 6 Coke’s R. 348, that lands in Ireland shall be assets to satisfy a bond debt here, but otherwise of lands in Scotland and it is also true that in 3 Vin. Abr. 141, also cited by Mr. Barton, the following passage appears : “ Lands in Ireland are assets to satisfy a bond debt in England, but it is otherwise of lands in Scotlandto which passage is appended as the only authority on which it rests a reference to the argument of Sir John Holt, in 1 Vern. 419, “citing it as resolved in Evans Sf As-cough’s, Latch 233, and Dowdale’s Case, 6 Coke’s R. 348.” The only authorities for the passage then, are the cases cited from Latch and Coke. These were both common law cases — the former being an action of trespass in the Court of King’s Bench, and the latter of debt in the Court of common pleas: and nothing which could have been said in them, however plainly expressed, *425 would have been regarded as authority on the question of the jurisdiction of a Court of chancery in personam, The case in Latch was decided in the reign of James the first; and the only edition of the report I have seen, is the original one by Walpole, written in Norman French, which I do not understand. I cannot therefore undertake to say, what was said in the case in relation to assets by descent, or in what connection it was said. The case in 6 Coke 348, Dowdale's Case, was decided in the same reign. But nothing was said in it about assets by descent in a foreign country. It was an action of debt against an executor, who plead plane administravit. The jury found that there were assets, but that they were beyond sea or in Ireland. It was resolved, “ that the jurors have found the substance of the issue, that is to say, assets; and the finding that they are beyond sea is surplusage. For if the executors have goods of the testator’s in any part of the world, they shall be charged in respect of them, for many merchants and other men, who have stocks and goods to a great value beyond sea, are indebted here in England; and God forbid that those goods should not be liable to their debts, for otherwise there would be a great defect in the law.” In Dowdale’s Case the question was as to the difference between local and transitory actions, and whether a jury could find transitory things in another country. It was necessary for the parties in pleading to name a certain place for a venue, and the question in the case was whether the evidence of the parties and finding of the jury must be literally confined to the place named in the issue, or might be applied to any other place. It was in reference to that question that it was said by counsel in argument, to have been decided in an action of debt against an heir on the bond of his ancestor in which the defendant pleaded “ nothing by descent,” and the plaintiff averred assets by descent in London, and gave in assets in *426 Cornwall, that the jury could not find this local matter . - a foreign country. But the Court, in answer to this argument, said: “ God forbid but that the jury may - , .it . , ... hud assets by descent m any other county within England; for the law is that the plaintiff in such case shall have in execution all the lands which the heir has, and perhaps he has lands in divers counties; and therefore, although one place be named for necessity, yet the jury may find all that which by law shall be chargeable in such case, in what town or county soever it lies.”
The distinction between Ireland and Scotland referred to arguendo, by Sir John Holt, was founded on the idea that seems at that time to have existed, that Ireland being a 11 conquered kingdom” the judgments and decrees of the English Superior courts could be enforced by them in that country. And therefore Lord Holt said, “ That Ireland hath its Courts of its own by grant from the King ; but not exclusive of the King’s Courts here, for Ireland is a conquered kingdom ; and a decree of this Court may as well bind land in Ireland, as by every day’s practice it doth lands that lie in foreign plantations : and for precedents cited the case of a scire facias brought in the chancery here to repeal a patent of lands in Ireland. If a man that is benefieed here is made a bishop in Ireland, that comes within the statute of H. 8, against pluralities, and shall make void his living here in Ireland; and it was resolved in Evans & Ascough’s Case, Latch, fol. 233, and Dowdale’s Case, 6 Coke’s R. 348, that lands in Ireland shall be assets to satisfy a bond debt here, but otherwise of lands in Scotland.” And in the case of Sir John Fryer v. Bernard, 2 P. Wms. 261, referred to in Raithby’s note to 1 Vernon 76, it seems that a sequestration was awarded by the English Court of chancery against defendant’s real and personal estate in Ireland, a sequestration having been first taken out in England and returned nulla bona.
*427 Now it is not pretended by any that the Courts of one state can enforce their judgments in another; and therefore in a suit at law against an heir, land descend- , , . , , . . . ed to him in another state cannot be regarded as assets by descent, because the writ of extendi facias cannot be enforced against it. But the question in this case is not whether land descended in another state can be regarded as “ assets by descent,” technically speaking, here, for what is to be regarded as “ assets by descent,” in a technical sense, must be only such as are made so by our own law, and as are within the reach of our own Courts. The question is whether a trust created by or under the laws of another state can be enforced against a trustee residing here? And I think it clearly can. It matters not whether the trust be created by the act of the parties, or by the local law. In either case the lex loci is administered. Nor does it matter that the trust relates to an immovable subject in another state, provided the decree does not invade the jurisdiction or the sovereignty of that state. And there can be no invasion of that jurisdiction or sovereignty where we only require our own resident citizens to do that which if voluntarily done would be valid in that state. A fortiori, there can be none where the subject has been sold and the money is in their hands.
As to the statutes of 5 George II, ch. 7, and 9 George IV, ch. 33, mentioned in Ram on Assets, 8 Law Lib. 158, referred to by Mr. Morson ; they were not passed because they were considered necessary to enable an English Court of chancery to enforce, against a trustee residing in its jurisdiction, the execution of a trust concerning foreign land; nor for the purpose of giving that Court any jurisdiction in regard to such land descending to a person residing in its limits. Those statutes merely make real estate in certain colonies and provinces of England assets by descent for the payment of debts generally; instead of certain specialty debts *428 only as at common law j and provide remedies against those assets, to be had in the colonial and provincial Courts, arid not the Courts of England. This was a mere exercise of legislative power over a part of the British dominions, and I do not see how it can affect the question under consideration.
I will now proceed to consider the last question arising in the case ; and that is,
4thly. Whether, in fact, any lands in Kentucky descended from Richard Hoomes to his children; and if they did, whether they were not forfeited for non-payment of taxes; and whether such of them as were held by the children were held by them as purchasers from the State of Kentucky, and not as heirs of their father ?
When John Hoomes the elder died in 1805, he appears to have been entitled to 18 or 20,000 acres of land in Kentucky, which, as a part of the residuum of his estate, he charged by his will with the payment of his debts ; and the surplus of which he devised to his five children, John, William, Richard, Ármistead and Sophia, “ to hold the same in fee simple subject to the condition or contingency to which their other property was subject.” So that to one undivided fifth of these lands, subject to the charge aforesaid, Richard Hoomes became entitled as .devisee of John Hoomes the elder. These lands, or the greater part of them, seem to have remained undisposed of at the death of Richard Hoomes in 1823; eighteen years after the death of his father John Hoomes. The appellant contends that the portion of these lands to which Richard was entitled at the time of his death descended to his children, and became assets by descent liable for his debts by the law of Kentucky. To this claim several objections are made by the appellees.
1st. They insist that Richard had never any actual seisin of the Kentucky lands. That by the common *429 law he could not be the stock of the descent of any portion of the said lands to his children, who must claim, if at all, under the ancestor last actually seised, according to the maxim, non jus, sed seisina facit stipitem,: and that this rule of the common law, so far as appears from the record, is still the law of Kentucky.
I do not think this objection is well founded, for several reasons. 1st. I think, as was said by the Supreme court of the United States, in the case of Green v. Liter, 8 Cranch’s R. 229, “ that even if, at common law, an actual pedis positio, followed up by an actual perception of the profits, were necessary to maintain a writ of right, (or, in this case, to constitute a stock of descent,) which we do not admit, the doctrine would be inapplicable to the waste and vacant lands of our country, (such as were the lands in Kentucky owned by John Hoomes the elder at his death.) The common law itself in many cases dispenses with such a rule; and the reason of the rule itself ceases when applied to a mere wilderness.” And I therefore think that if John Hoomes the elder was seised of these lands at the time of his death, and they were not in the adverse possession of others at the time of Richard Hoomes’s death, he was sufficiently seised of his portion of them to make him a stock of descent on common law principles as modified by the condition of the country. 2dly. If John Hoomes the elder was seised of them at the time of his death, which is not denied, he had a right to devise them even according to the English statute of wills, and his devisees became by the devise seised in deed without any actual pedis positio, or taking of the esplees. The maxim seisina facit stipitem is inapplicable to such a case. The children of Richard Hoomes must take his portion of the lands as his heirs, or not at all. They cannot take it as heirs at law of John Hoomes the elder, because it was effectually devised by him to Richard. The de *430 vise broke the descent. Suppose the devise had been to a stranger instead of a son, the heirs of the stranger could not claim under the testator as a stock of descent, and could only claim by inheritance from their father. ^aw having authorized the devise, the estate thereby conferred was as perfect as if it had been conferred by the common law feoffment with livery of seisin. The will operates like a deed of bargain and sale or other conveyance under the statute of uses, by virtue of which the bargainee has a complete seisin in deed, without actual entry or livery of seisin. 3dly. It is proved by Herndon, and would have been presumable if not proved, for reasons which I have before stated, that the statute of descents of Kentucky is similar to the statute of descents of Virginia, in declaring “ that henceforth when any person having a title to any real estate of inheritance, shall die intestate as to such estate, it shall descend,” &c. I think that “ the common law rule, seisina facit stipitem, may now therefore be regarded as abrogated in” Kentucky as well as “ in Virginia ;” and that there as well as here, “ having title to any real estate, is alone sufficient to make the intestate the root of the inheritance.” 1 Lomax’s Dig. 594, § 2.
2dly. They insist that none of these lands have come to their hands, except 635 acres, which they contend was afterwards forfeited for non-payment of taxes and sold and conveyed by the agent of the state to Richard H. Hoomes, one of the heirs of Richard Hoomes, who thereby acquired “ a title in the said lands by purchase from the state, and not by descent from his ancestor.”
The answer of the appellees, the hieirs of Richard Hoomes, to the supplemental bill of the appéllant, expressly admits, that on the 6th of May 1833, 2726 acres of these Kentucky lands were divided among the parties entitled thereto by commissioners appointed for the purpose; and that 635 acres thereof were allotted to *431 the said heirs of Richard Hoomes, of which 75 acres were apportioned to Williamson Tally as compensation for his services in procuring the same to be divided and allotted. They further say that from J;he best information they have been able to obtain, the land allotted to them did not exceed the value of 1 dollar 25 cents per acre; and that they did not realize from their sale a greater sum. They further say they have good reason to believe that other lands in the State of Kentucky were in the seisin and possession of their grandfather John Hoomes, but such have never come to their possession.
Now here is a solemn admission, that 635, minus 75, acres of these lands have not only come to their hands, but been by them converted into money. To be sure, they “insist that these lands were derived by them under the will of their grandfather, and were, not inherited from tlielr father.” But this is a question of law about which I think, and have endeavoured to shew, they are mistaken; at least as to so much of the land as their father was entitled to at the time of his death; for they were themselves entitled to a portion of it as contingent devisees of their grandfather, according to the decision of this Court in the case reported in 1 Grattan.
How is the force of this admission to be avoided, if I am right on the question of law aforesaid ?
After the answer had been written and signed, an addition was made thereto to the following effect: “Your respondents beg leave further to state to your honour, a fact omitted to be stated in the body of their answer; that is to say, that on the day of 1842, a certain tract of land containing 2086 acres, and situated in the county of Anderson and State of Kentucky, and entered for taxation in the name of John Hoomes, was struck off to the State of Kentucky for the non-payment of the tax due thereon; which said land was after- *432 wards, to wit, on the 21st of May 1845, sold and conveyed by John Draffin, agent for the commonwealth, to your respondent Richard H. Hoomes, by the name of jjoorneS) for SHm of 80 dollars 71 cents, py reason whereof the title to the said land became vested in him as purchaser from the State of Kentucky. Your respondents believe, and therefore aver and charge, that the said 2086 acres are the same lands, or parcel of the same lands, mentioned in the report of commissioners McBrayer and Herndon mentioned in this answer; all which will more fully and at large appear by reference to an attested copy of the said report, and a like copy of the said deed filed with this answer and prayed to be taken as part thereof.”
The Circuit-court was of opinion, and the appellees’ counsel contend, that the 2086 acres above mentioned were in fact, as believed by the said respondents, to be parcel of the 2726 acres which were divided as aforesaid — while, on the other hand, the counsel for the appellant contend that they are different lands. The respondents were not themselves certain that they are the same lands, but only believed so ; and on that account, as well as on account of the doubt in which the evidence leaves the question, it would have been proper, I think, to have referred it to a commissioner, even if the right of the appellant to relief had depended upon it.
But does the right of the appellant to relief depend upon the question whether they are the same or different lands. Suppose they are the same lands; what effect can that fact have on the rights of the parties ? None, I conceive; unless it be to make the land which was allotted to the heirs of Richard Hoomes as aforesaid, chargeable with a due proportion of the 80 dollars and 71 cents, paid by Richard H. Hoomes in discharge of the arrears of tax due upon the 2086 acres sold and conveyed by the agent of the State of Kentucky for the non-payment of the tax due thereon as *433 aforesaid. The 2726 acres of land aforesaid had come to the hands of the parties, and been divided. Arrears of taxes are suffered to accrue thereon.; and in 1842, nine years after the division, they are struck off to the state for non-payment of the taxes. In 1845, twelve years after the division, they are sold and conveyed by the agent of the state, for the “ amount of tax, interest and charges due thereon, to Richard H. Hoomes one of the heirs of Richard Hoomes. I am now supposing that they are in fact the same lands. Can these heirs now say that their responsibility for these lands as assets by descent was discharged by this forfeiture and sale, and conveyance to one of them ? Had that one any right to redeem these lands from forfeiture, or purchase them for his own benefit, in exclusion of his coparceners ? If he had any such right, did he do it ? Is there any pretension that they or their assigns have surrendered the land to him ; or accounted to him for the proceeds of sale ? Or paid to him anything more than their aliquot portions of the said sum of 80 dollars and 71 cents, if even they have paid that ? The probability, from the pleadings and the evidence, is that Richard H. Hoomes went out to Kentucky to look after these lands as agent for the heirs of his father or grandfather; and finding that 2086 acres of land standing on the tax book in the name of his grandfather had been struck off to the state, he redeemed or purchased it from the agent of the state by paying the amount of tax &c. due thereon. He and his principals and co-heirs probably doubted whether it was the same land or not, which had been divided between them. But, whether the same land or not, it was prudent to redeem it, and obtain a conveyance from the state. For if it was the same land, their title to what they had already obtained would be thus confirmed. And if it was different land, they would thus obtain so much more. Whether it was the same or different land, seems to have been re *434 garded by the appellees as a question of little importance; for, in the preparation of the body of their answer, they overlooked it altogether, and acknowledged themselves unconditionally to have received 635, minus 75> acres of the land-
Without pursuing this examination any further, I am very decidedly of opinion that the Court below should not have dismissed the appellant’s bill for want of proof of assets descended to the appellees from their father in Kentucky ; but that, it appearing from the evidence that 18 or 20,000 thousand acres of land in that state actually belonged to John Hoomes the elder at the time of his death; that though much the larger portion of it appears to have been forfeited for non-payment of taxes, yet these taxes all accrued, not only since the death of John Hoomes the elder in 1805, but since the death of Richard Hoomes in 1823; that the heirs of John Hoomes the elder and of Richard Hoomes, have by their agents from time to time looked after these lands, and surveyed, divided and made sales of portions of them; it should have been referred to a commissioner of the Court to enquire, ascertain and report what lands in Kentucky descended from Richard Hoomes to his heirs at law, and came to their possession; and the value and disposition which has been made thereof; and how much has been or is to be, and when, received by them for the said lands, or such part thereof as may have been sold by them, or for the rents and profits of any of the said lands; and what expenses have been necessarily incurred by them in looking after, obtaining possession of, dividing and selling the same and collecting the proceeds of sale; and any other facts which, in the opinion of the Court below, might have been necessary to shew what benefit the heirs of Richard Hoomes have derived from his land in Kentucky. To the extent of that benefit, I think they are, in equity, bound to indemnify the appellant against the recovery from him of *435 that portion of the land warranted by their father, to which this Court has decided them to be entitled as purchasers under the will of their grandfather, and of the rents and profits thereof. If the amount of that benefit is equal to, or greater than, the value of the said portion, and its rents and profits; then the said recovery should be altogether barred and enjoined. But if the amount of that benefit is less than that value, the portion of the warranted land to which the appellees are entitled should be subject to a charge for the said amount, and if the same be not paid in a reasonable time, should be sold for its payment.
Under the statute of 1798 of Kentucky, which we have seen is similar to 1 Rev. Code, ch. 99, § 21, if the warranted land were situate, and the suit to recover it were pending, in that state, the heirs would be bound for the value of the lands to them descended. So that if at the death of the ancestor the lands descended were of greater value than the land warranted, the title of the warrantee and his assigns would then be good against the heirs of the warrantor, and could not be defeated by the forfeiture of the land descended for nonpayment of taxes thereafter accruing, nor by any disparity that might thereafter arise between the relative value of the land descended and the land warranted. It was contended by Mr. Morson that heirs are not bound to pay taxes for the benefit of creditors, and that if by non-payment of taxes the descended land is forfeited the heirs will not thereby become liable to creditors for the value of the land. This may be so, as a general rule at least. But where there are no unsatisfied creditors of the ancestor except the warrantee ; and he becomes a creditor by a breach of the warranty occasioned by the recovery of the land from him by the heirs, I think the period of the ancestor’s death is that at which the rights of the parties become fixed, and the relative values of the lands descended and warrant *436 ed are to be ascertained, under the provisions of the statute above mentioned. It would be too strict however to apply the latter rule to this case. The heirs resided in Virginia, and the lands were wild and uncultivate<^> and scattered over the State of Kentucky. The quantity and locality of the lands were probably unknown to the heirs, who were infants at their father’s death; and cannot properly be considered as in default, by suffering any of the lands to be forfeited for non-payment of taxes, or by not having afterwards redeemed them from forfeiture. The appellant is seeking to enforce an equity against the heirs, and the just measure of that equity cannot exceed the benefit derived by them from the Kentucky land. But while on the one hand the heirs should not be charged with the value of such of the said land as may have been lost by forfeiture ; so on the other they should be charged with any rents and profits which may have been received by them on account of the said land. For though, as the law has been settled in Virginia, heirs are not bound for rents and profits accruing before a judgment or decree has been rendered against them, yet as in this case, we are departing from the letter of the Kentucky statute of 1798 for the purpose of doing equity between the parties ; and as an account has been decreed against the appellant in the Court below for rents and profits ; it would seem to be just and right that a corresponding account of rents and profits received by the heirs should also be taken. Otherwise, if the heirs were entitled to recover, but were not accountable for, rents and profits, they might, by delaying their suit until the amount of rents and profits of the warranted land was equal to the value of the land descended, recover the whole of the warranted land; whereas, if they had sued immediately after the ancestor’s death, they might have been barred of any recovery whatever. If the heirs prefer to account for the value of all the land de *437 scended, instead of the value of such of it as has come to their hands, with rents and profits actually received, of course they have a right so to account. But I imagine they would greatly prefer to account for the value of the descended land which has come to their hands, with rents and profits actually received, and interest on the price of such as they may have sold. Indeed I doubt whether any rents and profits have been actually received by them. But if any have, it is right they should account for them.
But it is contended by the counsel for the appellees that as the assets of Richard Hoomes were marshalled in a suit in Caroline, which was commenced in 1826 and ended in 1842, the style of which was Collins V. Garrett; and as the creditors in that suit were not entirely satisfied; they, if any creditors of Richard Hoomes, and not the appellant, are entitled to charge the appellees for the value of the Kentucky lands descended to the latter. The answer to this objection is, that a final decree was rendered in that suit in 1842. That the appellant was not a party to that suit, not considering himself a creditor until the decision of the case in 1 Gratt. 302, in 1844, and is therefore not bound by the decree. That by the Kentucky statute of 1798, the heirs are bound for the value of any land descended to them, and if this charge be not in its nature paramount to the claims of all other creditors of the ancestor, it would seem at least to be good against any claims which may not have been asserted before such charge is enforced by judgment or decree. And that at all events the appellant would be entitled to recover out of the Kentucky assets a proportion of his claim equal to that which other creditors of equal degree have recovered of their claims out of the Yirginia assets, before they could participate with him in the application of the former ; which would doubtless give to him the whole of the Kentucky assets.
*438 I have now considered all the questions presented by the record. My opinion has been protracted, perhaps, to too great length. But the number, novelty, difficulty and importance, of the questions involved, and the fullness and ability with which they were discussed by the counsel on both sides, seemed to render a long opinion necessary.
Allen, J.
I am of opinion, that the heirs cannot be called to account in a Virginia Court for real estate descended to them in another state, unless it shall appear that the heirs have disposed of the land and received the proceeds. That as to immovable property the lex rd sitce controls, and if subjected to the debts of the ancestor, it must be by the laws and through the tribunals of the country where it lies. That the mode of proceeding being in rem, to subject the thing itself, the Courts of a foreign jurisdiction can take no cognizance of it; nor would the Courts of the local jurisdiction, in a proceeding by creditors to subject the property itself in the mode prescribed by the local law, pay any respect to a proceeding in a foreign jurisdiction against the heir personally.
I am further of opinion, that it is not incumbent on the heir to redeem for the benefit of creditors waste lands descended to him, and which may have been forfeited for taxes accrued either before or after the death of the ancestor; and that if such forfeited land be thereafter sold for the non-payment of taxes, it is competent for the heir to purchase and hold as any other purchaser.
And being of opinion, that it does not appear that the heirs have received any thing from the Kentucky lands descended, except in respect to lands as to which the descent was broken by a sale for taxes, I should on that ground be for affirming the decree.
*439 On the other questions involved, I think the covenants in the deed bound the heirs, and that the recovery referred to constituted a breach, and that the covenants run with the land; and that the assignee, by deed of the whole or a portion thereof, is entitled to the benefit of the covenants, and may recover for the breach.
The decree was as follows :
A majority of the Court is of opinion,
First. That the covenant of Richard Hoomes in the deed to Samuel A. Apperson, in the proceedings mentioned, extends to the claim of the children of said Richard, which was sustained by this Court in the case of Dickinson v. Hoomes, 1 Gratt. 302; and will therefore be broken by an eviction under said claim.
Secondly. That it is a covenant running with the land; and the appellant, as assignee of a portion thereof by a regular chain of conveyances, is entitled to the benefit of the said covenant for his indemnity against the said claim.
Thirdly. That as by the law of Kentucky, as it existed at the death of said Richard Hoomes, and still continues to exist, lands in that state descending from an intestate can be subjected to the payment of his debts, by proceedings either in law or chancery; and “ if the deed of an alienor doth mention that he and his heirs be bound to warranty, and if any heritage descend to the demandant of the side of the alienor, then he shall be barred for the value of the heritage that is to him descended,-” a Court of equity of this state may compel the children of said Richard Hoomes, residing within its jurisdiction, to account for any lands in Kentucky descended to them as his heirs, as a trust subject for the payment of his debts. And although a Court of equity of one state, in the exercise of a sound judicial discretion, may in some cases decline to act on *440 persons residing or found within its jurisdiction, where the subject sought to be affected is situated in another State ’ case> ^ would be an exercise of sound judicial discretion on the part of the Circuit court °f Caroline to compel the said heirs, as a condition of the relief they are seeking as aforesaid against the appellant, to account to him, so far as may.be necessary for his indemnity against the breach of said covenant, for any benefit they may have received from any land in Kentucky descended to them from the said Richard.
Fourthly. That it appearing to the Court that John Hoomes the elder, was entitled at his death to eighteen or twenty thousand acres of land in Kentucky, to one fifth of which the said Richard became entitled as devisee of the said John, and remained so entitled at the death of him the said Richard in 1823; the said one fifth descended from the said Richard to his said children. And although it further appears to the Court, that the greater part of these lands were forfeited to the State of Kentucky for non-payment of taxes accruing thereon after the death of said Richard, and so may be forever lost to the said heirs ; and although it would be too strict, under the circumstances of this case, to hold the said heirs accountable, as for assets by descent, for the value of any lands so lost; yet, as it appears that a portion of said lands has actually come to the hands of the said heirs, and been by them converted into money; and that they may yet be entitled to other portions of them j the said Circuit court, instead of dismissing the bills of the appellant, should have directed one of its commissioners to enquire, ascertain and report what lands in Kentucky descended from the said Richard to his heirs, and have come to their hands or been sold by them, and the value or amount of sales thereof; what rents and profits, if any, have been received by them on account of any of the said lands; when any such *441 amount of sales, or rents and profits were so received; what expenses have been incurred by them or any of them in redeeming, obtaining possession of, surveying, dividing or selling any of the said lands, or collecting the rents and profits or proceeds of sale of any of them ; and any other facts which may, in the opinion of the said Circuit court, be necessary to ascertain the extent of any benefit received by the said heirs from the said lands. And if it should appear that the amount of said benefit is equal to, or greater than, the value of the land which the said heirs are entitled to recover of the appellant, and the rents and profits thereof, they should be altogether barred and enjoined from such recovery. But if the said amount should be less than the said value, rents and profits, then the payment of the same by them to him should be made a condition of their said recovery: and unless such payment be made in a reasonable time, the said land, or so much thereof as may be necessary, should be sold therefor.
Therefore it is considered, that the said decree is erroneous; that it be reversed and annulled with costs: and that the cause be remanded to be further proceeded in on the principles above indicated.